**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ABBEY S. SHELLEY,**

       **Plaintiff,**

   v.                                                          Civil Action 2:18-cv-676
                                                                         Magistrate Judge Jolson

**COMMISSIONER OF SOCIAL
SECURITY,**

       **Defendant.**

## OPINION AND ORDER

Plaintiff, Abbey S. Shelley, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her application for Title II Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Title XVI. For the reasons that follow, Plaintiff's Statement of Errors (Doc. 12) is **SUSTAINED** and the case is **REMANDED** to the Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g), sentence four.

I.    **BACKGROUND**

     **A. Prior Proceedings**

Plaintiff applied for DIB and SSI on August 22, 2013, alleging disability beginning July 14, 2013, due to numerous physical and mental impairments. (Doc. 11, Tr. 399, 404, 428). An Administrative Law Judge (the "ALJ") held a hearing (Tr. 36–88) after Plaintiff's application was denied initially and upon reconsideration. The ALJ then denied benefits in a written decision on. (Tr. 186–195). But the Appeals Council reviewed and remanded the case for a new hearing, which was held on October 4, 2017 (Tr. 89–126). The ALJ again denied benefits in a written decision.

(Tr. 14–27). That became the final decision of the Commissioner when the Appeals Council denied review. (Tr. 1–6).

This matter is fully briefed and ripe for resolution. (*See* Docs. 1, 11, 12, 15, 16).

### B. Relevant Testimony

At the time of the hearing, Plaintiff was 43-years-old. (Tr. 93). She is married and lives with her husband and 17-year-old child. (Tr. 94). At the time of the hearing, she was 5 feet tall and weighed 283 pounds. (*Id.*). She testified that she had gained nearly 60 pounds in the past year due to "not moving" and depression. (Tr. 95).

As for her work history, Plaintiff testified that, for seven months between 2015 and 2016, she worked 16 hours a week at a dog shelter. (Tr. 96). She explains that she was hired to do office work but was subsequently asked to work with the dogs, which forced her to quit because she could not tolerate being on her feet. (*Id.*). Before that, Plaintiff worked intermittently for more than five years at a gas station before quitting due to difficulty being on her feet all day. (Tr. 97–98).

When asked which of her physical issues was the most severe, Plaintiff responded that her neuropathy is the most limiting, describing the pain as "shoot[ing] up and down" both legs. (Tr. 99). In the five or so months leading up to the hearing, she had experienced "severe swelling" due to the beginning stages of kidney failure. (Tr. 100). When asked about her hand surgeries, Plaintiff explained that she had received multiple carpal tunnel release surgeries. (Tr. 106).

With regard to her mental health, Plaintiff testified that she gets "really snippy and agitated very easily," cries "a lot," sleeps "a lot," and has isolated herself. (Tr. 104). Her mental health

issues have put a strain on her marriage. (*Id.*). Plaintiff also described anxiety and panic attacks brought on by being around a lot of people. (Tr. 105).

As far as household tasks, Plaintiff's children help her with shopping, yardwork and cleaning, but she is able to straighten up around the house. (Tr. 113). She spends her days on Facebook, reading, and watching TV. (Tr. 114, 115, 118). When asked to describe her pain on a 0 to 10 scale, Plaintiff said she experienced a level 8 pain even with medication. (Tr. 120).

Finally, a Vocational Expert ("VE") opined that Plaintiff could perform the requirements of a document preparer, inspector, and sorter. (Tr. 123).

### C. Relevant Medical Background

#### 1. *Physical Health*

The record demonstrates a myriad of physical health problems, ranging from leg and foot problems to back issues.

In August 2012, Plaintiff received treatment for bilateral leg and foot pain. (Tr. 563). She had been struggling with tingling and sharp shooting pains for six months. (*Id.*). Records show crepitus in Plaintiff's knees, bilaterally. (Tr. 565). June 2013 physical exam records show diminished sensation in her toes. (Tr. 537–39). Records from a July 2013 musculoskeletal exam indicate that Plaintiff maintained normal range of motion, muscle strength, and stability in all extremities with no pain on inspection. (Tr. 535).

In August 2013, Plaintiff received treatment at the emergency room for a foot injury. (Tr. 613). She injured her foot while vacuuming when the cord wrapped around her foot, which she could not feel because of her neuropathy, causing her to fall and fracture her toe. (Tr. 615–16). In September 2013, Plaintiff saw neurologist Dr. Robert Thompson. (Tr. 663). At the appointment,

3

she described neurological symptoms for the past four years, and also reported that her knees lock up, she gets arthritis, and experiences numbness and tingling in both lower and upper extremities along with swelling in her feet. (*Id.*). She also reported difficulty using the stairs, resulting in several falls. (*Id.*). Dr. Thompson noted Plaintiff's gait as slow and cautious and reported that she is areflexic in both lower extremities, displayed crepitus and discomfort during range of motion testing, and suffered diminished sensation to all modalities in a stocking glove distribution in both feet. (Tr. 664). In September 2013, Dr. Thompson opined that Plaintiff's EMGs and nerve conduction velocities of both lower extremities were abnormal, consistent with severe mixed polyneuropathy, mainly axonal in nature. (Tr. 662). A September 2013 arterial study of Plaintiff's lower extremity revealed normal findings. (Tr. 690). Three months later, Plaintiff complained of a "dead weight" sensation in her legs. (Tr. 683).

On June 24, 2014, Plaintiff began seeing Dr. Tony Starr, who noted that Plaintiff suffered from sub patellar crepitus with flexion and extension. (Tr. 769). On July 24, 2014, she saw Dr. Corey Jackson for bilateral knee pain and swelling. (Tr. 738). At that appointment, Dr. Jackson documented Plaintiff's patellar crepitation. (Tr. 739). The exam revealed a full range of motion and strength, and x-rays of her knees showed mild osteoarthritic changes in the medical compartment. He observed that her weight was likely causing "additional discomfort" and offered an injection at the time, which she "deferred." (*Id.*).

On January 26, 2015, Plaintiff received treatment from pain specialist, Dr. Michael Sayegh. (Tr. 749). Plaintiff reported pain at a severity of 9 on a scale of 10 in both arms, her mid-back, and both legs. (*Id.*). Dr. Sayegh's exam notes show a mild decreased sensation in both arms and hands up to the mid-biceps, which was worse on the right, weakened bilateral grips, mild decreased

4

sensation in bilateral legs, and moderate decreased sensation in her feet. (*Id*.). He noted bilateral weakness in her legs, a decreased push/pull, and increased pain and tenderness with movement in both hips. (*Id*).

In March 2015, Plaintiff returned to Dr. Starr for neuropathy spreading to her back. (Tr. 758). Dr. Starr ordered an EMG with nerve conduction study, which took place on April 11, 2015. (Tr. 760–62). The test results show severe carpel tunnel syndrome in both hands. (Tr. 762).

On April 23, 2015, Plaintiff told Dr. Sayegh that her pain medication had not alleviated her pain. (Tr. 747). Dr. Sayegh noted that Plaintiff continued to suffer mild decreased sensation in both arms and hands up to the mid-biceps, which was worse on the right, weakened bilateral grips, mild decreased sensation in her legs, moderate decreased sensation in her feet, weakness in her legs, decreased push/pull, and increased pain and tenderness with movement in both hips. (*Id*.). On May 15, 2015, Plaintiff underwent carpal tunnel release surgery on her left wrist. (Tr. 734, 812). Post-surgery records show improvement but swelling in her bilateral wrists with tingling sensation in first three fingers. (Tr. 734, 812). Records from two weeks post-surgery document "improvement" in Plaintiff's condition, as she was able to make a full composite fist and had normal range of motion despite soreness. (Tr. 732). Plaintiff then received pain management treatment, including injection therapy, from Dr. Sayegh. (Tr. 741–45, 775).

In December 2015, Plaintiff alleged continued low back pain and bilateral hip and leg pain but acknowledged that medication seemed to help improve her symptoms and that injection therapy gave her relief for about a month. (Tr. 775). Physical exam records show trigger points and tenderness in the paraspinal muscles, and a neurological exam of upper and lower extremities showed mild decreased sensation with moderate decreased sensation in her feet. (*Id*.).

On January 10, 2016, Plaintiff underwent an MRI of her lumbar spine, which revealed left sided facet osteoarthropathy at L5-S1 but no degeneration or herniation. (Tr. 808). On January 25, 2106, Plaintiff saw Dr. Starr for her "locking" left thumb. (Tr. 910). Dr. Starr reported that her left thumb had a triggering effect with tenderness and a nodular area tendon of the flexor component below the MCP joint region. (Tr. 911). Plaintiff received injection therapy on her thumb. (Tr. 828).

On February 22, 2016, Plaintiff returned to Dr. Sayegh for further pain management. (Tr. 850). He noted that Plaintiff's physical examination still displayed mild decreased sensation in both arms and hands up to the mid-biceps, worse on the right, weakened bilateral grips, mild decreased sensation in bilateral legs, moderate decreased sensation in her feet, weakness and decreased push/pull in both legs, and increased pain and tenderness with movement in her hips. (*Id*.). Plaintiff returned every several months throughout the remainder of the year and continued to receive injection therapy for pain. (*See* Tr. 842, 844, 846, 848, 856–57).

On August 11, 2016, Plaintiff returned to Dr. Starr for left hand pain and swelling. (Tr. 920). Dr. Starr noted that she was suffering left wrist pain with tenderness at the ulnar aspect dorsally with questionable triggering of the little finger with pain associated with ulnar compression. (Tr. 921).

Finally, on June 28, 2017, Dr. Eyad Mahayri completed a sleep study of Plaintiff. (Tr. 1026). The study revealed "a significant number of respiratory events which were mainly obstructive and hypopnea in nature." (Tr. 1027). Dr. Mahayri diagnosed Plaintiff with severe obstructive sleep apnea, sleep related hypoxemia, and hypersomnia. (*Id*.).

## 2. *Mental Health*

On January 8, 2014, Plaintiff saw therapist Robert Block. (Tr. 698). She told him that she tries not to associate with people, suffers panic attacks when she goes into stores, and experiences problems with her medications. (Tr. 700–03). She reported that she had previously attempted suicide by slashing her wrists. (Tr. 707). She described anger problems and violent episodes, including impulsivity and hitting others. (Tr. 708). She also reported hearing voices and seeing shadows. (*Id.*). Mr. Block diagnosed Plaintiff with anxiety and depression. (Tr. 711–12). Plaintiff returned to see Mr. Block several times a month through May 2014. During these visits she reported episodes of violence and isolation. (*See generally* Tr. 698–715, 783–806).

On November 5, 2014, clinical psychologist James Spindler performed a consultative psychological evaluation of Plaintiff. (Tr. 665–70). He diagnosed Plaintiff with depressive disorder, not otherwise specified and anxiety disorder, and estimated her Global Assessment of Functioning ("GAF") at 61. (Tr. 669). On mental status examination, Plaintiff appeared cooperative and demonstrated no difficulty staying focused. (Tr. 667). She did not appear depressed or anxious and appeared comfortable with the interview process. (Tr. 668). She was alert and oriented and appeared to function in the average range of intelligence. (*Id.*). Her insight and judgment appeared within normal limits. (*Id.*). She also reported engaging in several activities of daily living, including caring for her son, caring for her dog, maintaining personal care, and tending to household chores, including washing dishes, vacuuming, and doing laundry. (*Id.*). She also reported having 10 friends with whom she enjoys talking. (Tr. 669). He further opined that Plaintiff appeared capable of understanding, remembering, and carrying out instructions; did not appear to have any major difficulty staying focused and would have the mental ability to sustain a

7

working pace and maintain a level of attention and concentration sufficient for most job settings; would likely respond appropriately to supervision and at least tolerate coworkers. (Tr. 670).

In January 2015, Plaintiff saw a new therapist, Kathy Soltis. (Tr. 723). Plaintiff explained that she had stopped attending counseling sessions because her regular counselor had quit, and she did not feel comfortable with the replacement counselor. (Tr. 729). Plaintiff reported that she had been feeling moody and angry, isolated herself, lacked motivation, and routinely overslept. (*Id.*). The next month, Plaintiff told Ms. Soltis that she was doing okay and was looking forward to spring. (Tr. 871). She expressed a desire to "work on" managing her depression. (*Id.*). She also hoped to be able to plant flowers and work in her yard. (*Id.*). Plaintiff continued to see Ms. Soltis through April of that year, and consistently reported anxiety and depression, often related to personal and familial issues. (*See, e.g.*, Tr. 873, 875, 877). It appears from the record, however, that Plaintiff stopped attending therapy in April 2015 and was discharged from the program in March 2017. (Tr. 883). On January 25, 2016, Plaintiff told Dr. Starr that her anxiety and depression were worsening, and her medications were not helping. (Tr. 910).

### D. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirement through December 31, 2018, and had not engaged in substantial gainful activity since July 14, 2013, the alleged onset date. (Tr. 17). The ALJ found that Plaintiff had the following severe impairments: diabetes mellitus with peripheral neuropathy, chondromalacia patella, bilateral osteoarthritis of the knees, bilateral carpal tunnel syndrome, lumbar-sacral facet osteoarthropathy, left thumb trigger finger, bilateral degenerative joint disease of the hips, sciatica, obesity, sleep apnea, major depressive disorder, bipolar disorder, generalized anxiety disorder, and adjustment disorder with anxiety and

depression. (*Id.*). The ALJ held, however, that there was no medical opinion of record to indicate the existence of an impairment or combination of impairments that met or equaled in severity the level of the Listings of Impairments. (Tr. 18).

In reviewing the evidence, the ALJ concluded that while Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, the medical evidence is "inconsistent" with Plaintiff's subjective allegations of pain and limitation. (Tr. 21). For example, the ALJ observed:

> . . . Despite the claimant's allegations of disabling physical impairments, examination findings of record have remained largely unremarkable. For example, records dated July 2013 include complaints of pain and numbness in the upper and lower extremities; however, on musculoskeletal examination, the claimant maintained normal range of motion, muscle strength, and stability in all extremities with no pain on inspection (1F/10). Neurological examination was negative as well (*Id.*). The following month, the claimant was noted to have several ailments including diabetes mellitus, but normal examination findings were noted (*Id*. at 5). It was further observed the claimant's medications resulted in stable condition (*Id*. at 6).

(Tr. 21). The ALJ also observed that, "aside from the claimant's CTS surgeries, she has not required other or additional surgical intervention." (Tr. 23). The ALJ elaborated:

> . . . she appears to have undergone relatively conservative treatment for her alleged pain in the form of medication management, brief physical therapy, and injections. The claimant has also acknowledged improvement with such treatment. Therefore, given the signs and findings on examinations, diagnostic tests, and treatment history, the undersigned finds the claimant remains capable of performing a reduced range of sedentary work . . .

(*Id.*).

As for Plaintiff's mental health symptoms, the ALJ found her allegations inconsistent with the objective medical findings. (Tr. 24). The ALJ explained:

> . . . the claimant alleged disability in part due to several mental impairments, which, among other things, caused her to isolate herself from others. She testified that she

9

had only one friend, who she talks with over the phone and does not interact with extended family. Indeed, she testified she had not spoken to her mother in approximately 20 years. She also testified that her knee pain interfered with her ability to travel and drive. The claimant testified she had not been able to take a vacation or travel. However, the record does not support the extent to which the claimant alleged she did not socialize with others, including her mother. While the claimant may have been estranged from her mother at one time, her Cambridge Counseling records showed she spoke with her mother (6F/3) and in March 2014, the claimant stated she was traveling to Georgia to visit her mother. (*Id*.).

(*Id*.).

The ALJ then turned to the opinion evidence. He assigned "some weight" to the opinion of state agency psychiatrist, Dr. Cacchillo, who completed a physical RFC on January 23, 2014, and opined that Plaintiff could perform a range of light work. (*Id*.). The ALJ explained that "[n]ew evidence received at the hearing level, including the testimony of the claimant, subsequent CTS surgery, and continued complaints of pain and limitation support a finding of greater limitation, as provided above." (*Id*.).

Next, the ALJ assigned "some weight" to the opinion of clinical psychologist Mr. Spindler, who completed a psychological evaluation of Plaintiff on November 4, 2014. (*Id*.). The ALJ assigned it only some weight because he "had the opportunity to evaluate the claimant in person, but only on one occasion and not in a treating context." (*Id*.). Moreover, the ALJ found that "while his assessment appears generally consistent with signs and findings on evaluation, the medical evidence of record as a whole, including the testimony of the claimant and subsequent treatment records detailing continued mental distress, support a finding of greater/additional mental limitation, as reflected above." (Tr. 24–25).

Finally, the ALJ assigned "great weight" to the opinion of Plaintiff's therapist, Kathy Soltis, who completed an initial evaluation of Plaintiff. The ALJ explained that although Ms.

Soltis is not considered an "acceptable" medical source, "her assessment appears based on and consistent with signs and findings on evaluation and largely consistent with the record as a whole, including the claimant's own reports of functioning." (Tr. 25).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)). In other words, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

Plaintiff, in her sole assignment of error, asserts that the ALJ's RFC is not supported by substantial evidence. Specifically, Plaintiff states that, because the only medical opinions were from 2014 and 2015, the ALJ erred in failing to obtain a physical and psychiatric medical opinion for the 2016–2017 records. (*See generally* Doc. 12 at 10–15). In support, Plaintiff relies on the seminal case in this Circuit addressing this issue, *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008). Ultimately, the court in that case was presented with the same question before the Court here: What is the ALJ's additional obligation, if any, in a case where the medical record, or a substantial portion of the medical record, is devoid of a medical opinion? *See id.* at 910–11.

### A. The *Deskin* Rule

In *Deskin*, the only medical opinion in the record came from a state agency reviewing physician issued in October 2003. *Deskin*, 605 F. Supp. at 910. But the record also contained two years' worth of medical records post-dating that opinion. *Id.* Up front, the court noted that, in social security cases, the plaintiff bears the burden to prove disability. *Id.* at 911. The Agency, however, bears the burden to develop the record. *Id.* As part of that burden, it is "critical" that the ALJ obtain and consider residual functional capacity opinions offered by medical sources such as treating physicians, consultative examining physicians, medical experts who testify at hearings before the ALJ, or state agency physicians who reviewed the claimant's medical records. *Id.* at 911–12. This means, therefore, that an ALJ "may not interpret raw medical data in functional terms." *Id.* at 912. With that principle in mind, the court set forth the following rule:

> . . . where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining

12

agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows relatively little physical impairment and an ALJ can render a commonsense judgment about functional capacity.

*Id*. at 912 (quotation marks and citation omitted).

At first, *Deskin* was not met with open arms. Indeed, a judge in the same court rejected *Deskin*, finding it "not representative of the law" because the ALJ, "not a physician is assigned the responsibility of determining a claimant's RFC based on the evidence as a whole." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010). Roughly a year and a half after *Henderson*, the author of *Deskin* reaffirmed the ruling but made several caveats regarding its application. S*ee Kizys v. Comm'r of Soc. Sec.*, No. 3:10-cv-25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011). And *Deskin* potentially applies in only two circumstances. *See id*; *see also Raber v. Comm'r of Soc. Sec.*, No. 4:12-cv-97, 2013 WL 1284312, at *15 (N.D. Ohio Mar. 27, 2013) (explaining post-*Deskin* application of the rule). First, *Deskin* matters where an ALJ made an RFC determination based on no medical source opinion. *See Kizys*, 2011 WL 5024866, at *2. Second, *Deskin* also matters where an ALJ made an RFC based on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence." *Id*.

Importantly, simply because a case falls within the *Deksin* rule does not mean that the court must remand the matter. In certain circumstances, an ALJ still has "discretion" to develop an RFC without a proper medical opinion "where the medical evidence shows relatively little physical impairment" such that "an ALJ can render a commonsense judgment about functional capacity." *Id*. (quotation marks and citation omitted). These occasions, however, are "limited" and the

13

medical evidence must be "so clear" and "undisputed," that an ALJ could justifiably make an RFC finding without the aid of a current medical source. *Harris v. Comm'r of Soc. Sec.*, No. 15-10966, 2016 WL 8114128, at *10 (E.D. Mich. Mar. 2, 2016), *report and recommendation adopted sub nom. Harris v. Colvin*, No. 15-CV-10966, 2016 WL 2848422 (E.D. Mich. May 16, 2016) (citations omitted). At base, the "key inquiry" when deciding whether to remand under *Deskin*, is whether the ALJ "fully and fairly developed the record through a conscientious probing of all relevant facts." *Bryant v. Comm'r of Soc. Sec.*, No. 3:15-CV-354, 2017 WL 489746, at *3–5 (S.D. Ohio Feb. 7, 2017) (quotation marks and citation omitted), *report and recommendation adopted sub nom. Bryant v. Berryhill*, No. 3:15-CV-354, 2017 WL 713564 (S.D. Ohio Feb. 22, 2017).

### B. The *Deskin* Rule Applied

The Court must consider *Deskin*'s import because the facts here fall into the second category of cases in which the ALJ relied on "outdated" medical source opinions. Yet, as noted, remand is not triggered automatically. Instead, the Court must decide two things: first, whether the evidence without a medical opinion constitutes "a critical body of objective medical evidence;" and second, whether that evidence "shows relatively little physical impairment" so that the ALJ was able to make a "commonsense judgment" about Plaintiff's functional capacity. *See Deskin*, 605 F. Supp. at 912.

First, Plaintiff states that there are three years of medical records without an opinion source and two years of mental treatment records without an opinion source. (Doc. 12 at 12). The Court finds—and Defendant does not argue otherwise—that this constitutes a "critical body" of objective medical evidence. As discussed below, Plaintiff underwent multiple procedures for her physical symptoms and had dozens of appointments in the years since the last medical opinion was issued.

Plaintiff's mental health records, however, present a closer question. There are simply not as many mental health records in the recent years. But, as discussed more fully below, the ALJ presumably found that the record and Plaintiff's testimony showed that Plaintiff's mental health condition deteriorated since the opinions were issued, and as such, greater functional limitations were necessary. (*see* Tr. 24–25). Accordingly, the Court finds that the additional evidence constitutes a "critical body" under *Deskin*.

Second, the Court must decide whether the subsequent evidence shows "relatively little" impairment such that the ALJ could, without the benefit of a source opinion, render a functional capacity opinion. *See Deskin*, 605 F. Supp. at 912. Generally, when a plaintiff "has sufficiently placed his or her functional inability at issue, the ALJ must measure [his or her] capabilities," and in doing so, "an expert's RFC evaluation is ordinarily essential." *Mabra v. Comm'r of Soc. Sec.*, No. 2:11-CV-00407, 2012 WL 2319245, at *10 (S.D. Ohio June 19, 2012), *report and recommendation adopted*, No. 2:11-CV-00407, 2012 WL 3600127 (S.D. Ohio Aug. 21, 2012) (quotation marks and citation omitted). But "[t]here are limited occasions when the medical evidence is so clear, and so undisputed, that an ALJ would be justified in drawing functional capacity conclusions from such evidence without the assistance of a current medical source." *Harris*, 2016 WL 8114128, at *10 (citations omitted).

Defendant argues that Plaintiff does not cite evidence showing that her impairments caused functional limitations and that the ALJ properly considered all of the evidence. (*See generally* Doc. 15 at 6–12). Specifically, Defendant emphasizes the ALJ's treatment of the opinion evidence. Plaintiff emphasizes this, too, but for different reasons. In reviewing the opinion evidence that predated numerous medical records, the ALJ acknowledged that the subsequent

evidence justified greater restrictions. Indeed, the ALJ assigned less weight to nearly all of the opinions, largely because substantial evidence post-dating the opinions showed the need for greater restrictions.

For example, in reviewing the opinion of Dr. Cacchillo, who completed a physical RFC assessment and opined that Plaintiff could perform a range of light work, the ALJ found that the opinion was entitled to only "some weight" because "[n]ew evidence received at the hearing level, including the testimony of the claimant, subsequent CTS surgery, and continued complaints of pain and limitation support a finding of greater limitation[.]" (Tr. 24). Similarly, when reviewing the opinion of Dr. Tishler, who completed a psychiatric review of Plaintiff, the ALJ afforded the opinion "little weight," explaining that it was "inconsistent with the record as a whole, including the testimony of the claimant regarding continued depression, anxiety, and panic attacks, as well as subsequent treatment records documenting such complaints." (*Id*.). And, when reviewing the opinion of clinical psychologist James Spindler, who completed a consultative psychological evaluation of Plaintiff, the ALJ assigned the opinion "some weight," explaining that "while his assessment appears generally consistent with signs and findings on evaluation, the medical evidence of record as a whole, including the testimony of the claimant and subsequent treatment records detailing continued mental distress, support a finding of greater/additional mental limitation[.]" (Tr. 24–25).

While Defendant relies on the above analysis as proof that the ALJ carefully considered all of the evidence, the Court finds that the opposite is true. Indeed, this Court recently remanded an ALJ's decision with facts similar to those here. *See Snell v. Comm'r of Soc. Sec.* No. 3:18-CV-173, 2019 WL 3406435, at *3–4 (S.D. Ohio July 29, 2019). There, the record contained two

16

medical opinions regarding the plaintiff's physical RFC. *Id*. at *3. But the record also contained two additional years of evidence, including a CT scan showing abnormal results. *See id*. And, like the ALJ here, the ALJ in *Snell* afforded the medical opinions only "some weight" because he found that the record contained "significant additional evidence," following these opinions, "which suggests need for some changes" to their RFC opinions. *Id*. (internal quotation marks omitted). Consequently, the Court remanded the matter under *Deskin*. *See id*. In doing so, the Court noted that, while "it is generally up to the discretion of the ALJ," "the use of a medical consultant was necessary—rather than simply helpful—in order to allow the ALJ to make a proper decision." *Id*. at *4 (quotation marks and citation omitted).

So too here. The fact that the ALJ found that the new evidence made the opinion evidence less relevant only underscores that the use of a current medical expert was necessary and not just merely helpful. *See id*.

Defendant also relies on the fact that the ALJ considered the evidence that post-dated the medical opinions, and reasonably found that they revealed unremarkable findings. But courts routinely reject similar arguments. For example, in this Court's decision in *Mabra*, 2012 WL 2319245, at *9–10, the ALJ rejected the opinion evidence for a number of reasons and, relying on "her own lay interpretation" of the MRIs, concluded that the record showed "relatively minimal clinical and diagnostic findings", and concluded that Plaintiff was capable of a full range of medium work. *Id*. at *8–9 (internal quotation marks omitted). Despite the ALJ's interpretation that the record contained "minimal" findings, the Court noted that the MRIs revealed "at least some level of degenerative changes in [plaintiff's] back" and that treatment notes "consistently included findings of tenderness." *Id*. The Court concluded that "[a]lthough Plaintiff's MRI results

17

may appear minimal to the lay person, the ALJ was not qualified to translate this medical data into functional capacity determinations." *Id.* (citing *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010)) (holding that, although MRI results showed only mild degenerative changes of a claimant's lumbar spine, "the ALJ was not at liberty to substitute his own lay interpretation of that diagnostic test for the uncontradicted testimony of [the treating physician], who is more qualified and better suited to opine as to the test's medical significance.")).

The same is true here. The ALJ interpreted "raw" medical records and concluded they showed minimal findings. (Tr. 23). But without a relatively recent medical opinion, the ALJ "was not qualified to translate this medical data into functional capacity determinations." *See id*. Indeed, while the evidence may appear minimal, Plaintiff's January 2016 MRI revealed left sided facet osteoarthropathy at L5-S1. (Tr. 808). Subsequent records also document consistent complaints of pain and injection procedures. (*See, e.g.*, Tr. 846, 850, 852, 856–58). Therefore, the Court concludes that the record "potentially indicate[s]" more than "relatively little" impairment. *Lachcik*, 2017 WL 2210276, at *4 (quoting *Deskin*, 605 F. Supp. 2d at 912). And, the record is not "so clear, and so undisputed" that the ALJ could justifiably make RFC conclusions from such evidence without the aid of a current medical source. *See Harris*, 2016 WL 8114128, at *10; *see also Lachcik*, 2017 WL 2210276, at *4–5 (remanding, noting that the record contained medical evidence, such as MRI results, "not easily understood by the layperson's eye and that potentially indicate more than relatively little physical impairment," including joint and nerve injections) (quotation marks and citation omitted); *Childress v. Berryhill*, No. 1: 16-CV-00119-HBB, 2017 WL 758941, at *4–6 (W.D. Ky. Feb. 27, 2017) (finding that while the ALJ considered subsequent MRIs and an EMG and attempted to downplay their results, the Court remanded the case, finding

18

that the ALJ made an RFC determination using "raw medical data."); *Wheeler v. Comm'r of Soc. Sec.*, No. 14-12540, 2015 WL 5461527, at *9 (E.D. Mich. Aug. 14, 2015), *report and recommendation adopted*, No. 14-12540, 2015 WL 5460709 (E.D. Mich. Sept. 17, 2015) (remanding, noting that Plaintiff presented subsequent evidence including MRI findings, evidence of trigger point injections, evidence of overwhelming pain examinations, and evidence that he was taking strong narcotic medications, among others).

Finally, as for Plaintiff's mental health treatment records, the ALJ did not explicitly discuss her recent mental health records but concluded that the record supported "a finding of no more than moderate mental limitation aside from social interaction." (*Id.*). To be fair, and as already noted, Plaintiff has not presented much in terms of her recent mental health treatment. But because the ALJ seemed to find that her testimony and the subsequent records supported greater limitations, (*see* Tr. 24–25), the Court can conclude only that the ALJ should have consulted an expert opinion regarding both her physical and mental health.

In sum, even if it does not result in a different outcome, remand is still appropriate. Upon remand, the ALJ shall obtain the opinion of an acceptable medical source regarding Plaintiff's physical and mental health impairments and any corresponding functional limitations.

## IV. CONCLUSION

For the reasons stated, Plaintiff's statement of errors (Doc. 12) is **SUSTAINED** and the case is **REMANDED** to the Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g), sentence four.

IT IS SO ORDERED.

Date: August 26, 2019

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE